GUILLERMO ATILES MORÉU, ADMINISTRADOR DEL FONDO DEL SEGURO DEL ESTADO, recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, ETC., demandada; y MATILDE ORTIZ DE SANTIAGO, obrera lesionada.

Número 469.

*Sometido:* 4 de marzo de 1953. *Resuelto:* 18 de mayo de 1953.

Donald R. Dexter, Aída Casañas O'Connor, Luis Muñiz Álvarez
y Rafael Oliveras Vera, abogados del recurrente; Miranda
Esteve & Martínez Álvarez, Jr., y A. Miranda Cárdenas,
abogados de la interventora, obrera lesionada.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opi-
nión del tribunal.

Matilde Ortiz de Santiago trabajaba en el Comedor Es-
colar del pueblo de Barranquitas. El día 28 de enero de
1952 faltó la persona encargada de la esterilización de la
vajilla en dicho comedor escolar, y Matilde tuvo que realizar
esa labor. En la mañana de ese día estaba lloviendo.
Entre 10:30 y 11:00 A.M. Matilde esterilizaba la loza al
lado de una ventana que estaba cerrada pero sin tranca, y
mientras recibía el vapor del agua caliente, la ventana se
abrió súbitamente y en ese momento ella sintió que el lado
derecho de la cara se le paralizó; que el ojo también quedó
paralizado, al extremo de que no podía cerrarlo, y que ade-
más la boca se le fué yendo poco a poco hacia un lado. Al
día siguiente, fué examinada por el Dr. Ramón Badillo,
quien encontró que la paciente sufría una parálisis facial
unilateral (tipo Bell) en el lado derecho y que no existía in-
fección de la mastoide del oído. Como a su juicio, la pará-
lisis pudo ocurrir bajo las circunstancias explicadas por Ma-
tilde, le recomendó que viera al Dr. Santiago, médico del
Fondo del Estado para que éste continuara atendiéndola.

El Administrador del Fondo del Estado negó a dicha empleada el derecho de tratamiento médico y compensación fundándose en que la parálisis no estaba relacionada con el accidente sufrido por ella. Apelado el caso para ante la Comisión Industrial de Puerto Rico, dicho organismo confirmó la decisión del Administrador y desestimó la apelación, ya que su asesor médico había informado que debía ser confirmada la denegación del caso. No conforme con dicha resolución, la lesionada solicitó y le fué concedida, una vista pública ante la Comisión Industrial. Después de considerar la prueba presentada por las partes, la Comisión dictó una resolución declarando el caso como uno compensable y ordenó al Administrador que extendiera a la lesionada toda la protección de ley.

En este recurso el Administrador del Fondo del Estado nos pide que revoquemos la decisión de la Comisión Industrial, fundándose en que dicho organismo cometió los siguientes errores:

1—"Cometió error la Comisión Industrial al apreciar la prueba médica de carácter pericial. (Véase Art. 11, Ley núm. 45 de 1935, según quedó enmendada por la Ley 121 de 1940)", y

2—"Cometió error de derecho la Comisión Industrial al compensar este caso sin mediar en el mismo los tres requisitos legales necesarios."

El primer error señalado no fué cometido. Al referirse a la prueba médica de carácter pericial, la Comisión dice en su resolución, lo siguiente: "Indudablemente que la prueba médica que desfiló ante nosotros en la vista pública es completamente contradictoria. De una parte, dos peritos que nos dicen que la parálisis que sufrió esta lesionada era del tipo Bell que no tenía que ver nada con el accidente alegado, y de otra parte, un perito que nos dice que sí existe relación entre la condición que él observó de una parálisis facial y el accidente alegado, o sea, el cambio brusco de temperatura. Se recordará que en el curso de esta reso-

lución expusimos los cinco fundamentos en que se basó el Dr. Badillo para considerar este caso como uno compensable . . ."(¹)

La Comisión está en lo cierto. El Dr. F. Velázquez, médico del Fondo del Estado y el Dr. J. Cordero, asesor de la Comisión, rindieron un informe escrito en el sentido de que la parálisis facial que sufría la lesionada no era el resultado del accidente alegado por ella.(²)  Como único perito del Fondo del Estado declaró el Dr. Velázquez. Dijo que había examinado a Matilde Ortiz Santiago el día 4 de febrero y notó que presentaba una parálisis facial tipo Bell, es decir, una parálisis facial periférica. Luego agregó: "Estas parálisis faciales de este tipo han sido descritas como parálisis faciales esenciales, de tipo genético, de origen desconocido. Se le llamó hace años 'a frigore', pero nada tienen que ver con el frío o con el calor. Muchas veces están envueltos trastornos infecciosos en el oído y en la mastoide—se investigó en este caso y se encontró que la enferma presenta una retracción del tímpano—no había entonces fenómeno inflamatorio alguno ni ningún otro trastorno, y tuvimos en el momento de nuestro examen que llegar a la conclusión que era ese tipo de parálisis 'Bell' que no está relacionada con ninguna causa conocida y que es más un tipo genético.

---

(¹) En la vista oral de este recurso ante este tribunal, el recurrente argumentó en el sentido de que los cinco fundamentos expuestos por el Dr. Badillo, eran para sostener su conclusión de que la parálisis sufrida por la obrera era de tipo Bell, y no para concluir que el caso era compensable.

(²) El informe suscrito conjuntamente por ambos peritos, dice así:
"Diagnóstico:
"Alega que mientras trabajaba en un comedor escolar esterilizando con agua caliente la vajilla 'contraje espasmo en la cara, quedando afectada de la vista y los oídos sufriendo además parálisis facial.'
"Resultado Examen Médico
"Por considerar que la parálisis facial que presenta no puede conectarse con las alegaciones.
"Examinada la lesionada y revisado el expediente del FSE encontramos que el examen practicado por el Dr. José T. Picó demostró una re-

Descarté el caso como compensable. Luego, más tarde, examinamos la obrera con el Dr. Cordero, médico de esta Comisión y concurrimos . . . concurrió él con el dictamen que yo había hecho en el Fondo. Mi opinión no ha variado, Sr. Comisionado, en el día de hoy." Más tarde, al hacerse referencia a un informe rendido por el Dr. Picó, y admitido en evidencia, que dice "El examen de su oído revela retracción del tímpano que en mi opinión no tiene relación con el alegado accidente", se le preguntó al Dr. Velázquez: "¿Esta retracción del tímpano, puede ser la causa de la parálisis ésta facial?" A lo que contestó, "Yo creo que no." Por otro lado, el Dr. Ramón Badillo, perito de la lesionada, declaró como sigue:

"Allá para enero, 29, cuando yo iba al municipio, el esposo de ella me dijo que tenía la esposa grave. Estando la esposa grave, tuve yo que por fuerza detenerme en su casa camino del Hospital Municipal para examinarla y la encontré con una parálisis facial unilateral, en el lado derecho, pero como ella se estaba lamentando de que le dolía detrás del oído derecho, pues entonces yo continué examinándola a ver si había la posibilidad de una infección de la mastoide o interna del oído; yo la examiné, la miré, tenía décimas de fiebre, la parálisis era muy marcada en el lado derecho. Entonces la impresión que yo tuve fué que era lo que nosotros le llamamos 'Bell's Paralysis'.

"P.—¿Y qué relación puede tener eso con el trabajo que ella hacía ese día?

tracción del tímpano en el lado derecho no relacionada con el accidente. Se nos informa que los exámenes serológicos practicados a la lesionada fueron negativos y en la actualidad presenta una parálisis periférica del nervio facial derecho (Tipo Bell) que de acuerdo con la descripción de la propia empleada está en período de regresión y que no creemos sea el resultado del alegado accidente.

"Recomendaciones

por lo que debe ser confirmada la denegación del caso.

"Fdo. Dr. Jeramfel Cordero
"Fdo. Dr. F. Velázquez
"13 de febrero de 1952."

Además el Dr. Velázquez había suscrito anteriormente otros informes sosteniendo igual conclusión.

"R.—Según el historial médico en el cual yo no entré mucho, pero que ella me informó que había estado o que había sucedido en el comedor escolar debido a cambios . . . de una corriente . . . por eso con el historial médico yo pude llegar al diagnóstico preliminar que era el que yo tenía momentáneamente, porque eso ocurre bajo esas circunstancias, como a ella le pasó, y no tuve yo que saber más del trabajo, sino que con el historial médico, entonces como ella informó que trabajaba en los comedores escolares, yo le dije: 'Es mejor que el Dr. Santiago, que es el doctor del Fondo del Estado, continúe con su caso.' Así es como yo procedo con esos casos que tienen que ver con el Fondo del Estado, se los refiero a él, entonces yo continúo con mi gente.

"P—¿Algo con el doctor?

"Lcdo. Rivera Valdivieso:

"P—¿En qué se basa usted para llegar a la conclusión de que ese era el tipo de parálisis que ella estaba sufriendo, doctor?

"R—Número uno: Historial médico; ese cambio de temperatura de momento, que ella reclama estaba esterilizando y que en eso aparece un síntoma; Segundo: Que no había infección en el oído interno. Tercero: Que es muy típico de estas parálisis de Bell encontrar un dolor tremendo detrás del oído del lado afectado al próximo día. Cuarto: Que la edad de ella, que estos casos ocurren en derrames cerebrales, la edad de ella no era . . . . no está en la edad que uno espera, una edad avanzada para estas parálisis faciales. Y quinto, que en el historial médico yo no encontré ninguna información sobre trauma, porque estos casos ocurren cuando ocurre un trauma y pueden ocurrir inmediatamente, estas parálisis son del séptimo nervio craneal."

Los peritos de ambas partes concurren en que la lesionada sufrió una parálisis facial (tipo Bell) del lado derecho. El Dr. Velázquez sostiene que las parálisis de ese tipo son de origen desconocido, y que aunque hace muchos años se les llamó "*a frigore*", nada tienen que ver con el frío o con el calor y que ese tipo de parálisis Bell no está relacionada con ninguna causa conocida y que es un tipo genético. Por el contrario el Dr. Badillo sostiene que un cambio súbito de temperatura puede causar una parálisis facial (tipo Bell) y que bajo las circunstancias expuestas por la lesionada, tal

cambio produjo lo que a ella le ocurrió, o sea, una parálisis facial.

Si consideramos que la lesionada no presentaba infección en el oído, ni señales de trauma, y además que la retracción del tímpano, observada por el Dr. Picó, no tenía relación con el accidente, ni podía ser la causa de la parálisis facial, según declaró el Dr. Velázquez, quedaba a la Comisión para su consideración, el testimonio del Dr. Badillo al efecto de que el cambio súbito de temperatura causó la parálisis facial a la lesionada. La Comisión dió crédito a esta teoría y por tanto, su conclusión al efecto de que existió una relación causal entre el alegado accidente y la lesión (parálisis facial tipo Bell) encuentra apoyo en la prueba. Hay autoridades que sostienen al Dr. Badillo. Refiriéndose a la parálisis de Bell, dice el Dr. Roy R. Grinker, en su obra "Neurología", segunda edición de 1942, traducida al castellano, lo siguiente, a la página 421:

"Aproximadamente el 75 por 100 de todas las lesiones del nervio facial están constituídas por las llamadas parálisis por frío 'por un aire', denominadas comúnmente *parálisis de Bell*. La parálisis de Bell se produce por la exposición al frío, como durmiendo en una habitación con corriente de aire o viajando junto a una ventana abierta en el tren o el automóvil. Se inicia bruscamente, con dolor retroauricular y de la nuca. La parálisis se observa al despertar por la mañana y puede afectar a todos los músculos faciales. Al comienzo puede haber fiebre. Con frecuencia se presenta en la edad avanzada y con gran alarma se la toma por una apoplejía. Hállase atacado en las enfermedades del oído medio con caries del peñasco. **Ocurre** con frecuencia en la neuritis múltiple la diplejía facial. Ocasionan lesiones faciales la sífilis meníngea, la meningitis o el aneurisma. Pueden seccionar el nervio las fracturas de la base del cráneo y las heridas cortantes a través de la glándula parótida. El nervio es traumatizado ocasionalmente en el recién nacido con el fórceps, y congénitamente puede faltar el núcleo."

Por el segundo señalamiento se plantea una cuestión más seria. Arguye el recurrente que nuestra Ley de

Compensaciones por Accidentes del Trabajo hace compensables, además de las enfermedades ocupacionales especificadas en la propia ley, aquellas lesiones que provengan de *accidentes* y que como en el presente caso no ha habido accidente alguno, ni se trata de una enfermedad ocupacional, erró la Comisión al concederle compensación a la obrera lesionada.

Conforme al artículo 2 de nuestro estatuto,(³) procede el pago de compensación a un obrero que sufra *lesiones* por *accidentes* que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurra en el curso de éste y como consecuencia del mismo. Sin embargo, el estatuto no define el término "accidente", ni tampoco ha sido definido en nuestras decisiones.(⁴) En aquellos Estados donde dicho término no está definido en la propia ley, ha sido usado en un sentido común y corriente, habiendo las cortes de esos Estados adoptado la siguiente definición de Webster: "Un suceso que ocurre sin uno preverlo o esperarlo; un suceso involuntario, súbito e inesperado; una contingencia casual o fortuita." Tanto las Cortes como las Comisiones han discrepado en la aplicación de esta definición. Sería labor inútil tratar de resumir el alcance que a dicha definición ha dado la jurisprudencia, en la variada situación de hechos presen-

---

(³) El artículo 2 de la Ley de Compensaciones por Accidentes del Trabajo, dispone:—

"Artículo 2.—Las disposiciones de esta Ley serán aplicables a todos los obreros y empleados que trabajen para los patronos a quienes se refiere el párrafo siguiente, que sufran lesiones o se inutilicen, o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste, y como consecuencia del mismo o por enfermedades o muerte derivadas de la ocupación, según se especifican en el artículo siguiente. Se exceptúan expresamente aquellos obreros y empleados dedicados al servicio doméstico y aquellos cuya labor sea de carácter accidental o casual y no esté comprendida dentro del negocio, industria, profesión u ocupación de su patrono y además aquellas personas que trabajen en sus domicilios."

(⁴) Véase, sin embargo, *Rodríguez* v. *Comisión de Indem.*, 36 D.P.R. 45, y *Atiles* v. *Com. Industrial*, 69 D.P.R. 630. No podemos afirmar que en este último caso hayamos adoptado una definición específica del término "accidente".

tada a los tribunales. Véase, sin embargo, para una recapitulación de las decisiones donde ha estado envuelta la definición de "accidente", el tomo 1 de Schneider, *Workmen's Compensation Law*, página 516.

La prueba médico pericial que la Comisión Industrial tuvo ante sí en este caso, estableció una relación causal entre el suceso calificado como "accidente" por la propia Comisión, y la parálisis facial (tipo Bell) sufrida por la obrera. Los síntomas de tal parálisis se manifestaron tan pronto como la ventana se abrió y la obrera recibió el impacto de una corriente de aire frío. En ese mismo instante la obrera estaba recibiendo el calor anormal producido por los vapores del agua caliente utilizada para esterilizar la loza. No hay duda de que tal suceso fué uno involuntario, repentino, imprevisto e inesperado.

Frecuentemente se ha sostenido, aun cuando hay decisiones en contrario, que lesiones causadas por los *elementos* (calor, frío, lluvia, relámpago, huracanes, etc.) a un obrero mientras se dedica a su trabajo, pueden considerarse como repentinas e inesperadas, y por tanto, de carácter accidental. Horovitz, *Workmen's Compensation Laws*, pág. 90. Como regla general se excluyen los accidentes que tienen lugar por las condiciones atmosféricas a las cuales todo el mundo está igualmente expuesto. *Crespo* v. *Com. Indem.*, 33 D.P.R. 831 y *Rosado* v. *Comisión de Indem. a Obreros*, 35 D.P.R. 985. No creemos sin embargo, que el presente caso caiga dentro de esa regla. La exposición de esta obrera al cambio súbito de temperatura, de calor a frío, cuando la ventana se abrió repentina e inesperadamente, no era una exposición común a la demás gente. Por razón de sus deberes, ella estuvo expuesta al peligro especial o peculiar de los *elementos* y tal peligro era mayor para ella [por razón de estar recibiendo calor anormal] que para las demás personas de la comunidad.

En el caso de *Lurye* v. *Stern Bros. Dept. Store*, 275 N.Y. 182, 9 N.E.2d 828, se declaró compensable una parálisis facial (tipo Bell) sufrida en circunstancias similares a la de este caso. Mientras Fannie Lurye se dedicaba en el curso regular de su empleo a mostrar unos sobretodos a un cliente de su patrono, otro co–empleado puso a funcionar un abanico eléctrico que lanzó una ráfaga de viento sobre ella, causándole escalofrío y resultando una parálisis de Bell. Se resolvió que la lesión era de carácter accidental.([5]) Se dijo en dicho caso:

"En el caso ante nos, la reclamante fué alcanzada por una corriente de aire impulsada por un abanico. El resultado fué 'una parálisis limitada a un lado de la cara, aguda en el primer ataque y que se le conoce por parálisis de Bell'—con la consiguiente deformación de esa región y de la facultad de expresión. Creemos que cualquier persona corriente diría que una incapacidad tan repentina y tan brusca como ésa era una lesión accidental, en tanto se sufrió de modo tan raro en el curso ordinario del trabajo diario. Véase *Lewis* v. *Ocean Accident & Guarantee Corporation, Limited, of London, England,* 224 N.Y. 18, 21,120 N.E. 56, 7 A.L.R. 1129. Parécenos que la analogía, igualmente, conduce a esa conclusión. 'La insolación, estrictamente hablando, es una enfermedad, pero lo repentino de su manifestación y su naturaleza catastrófica han motivado el que sea clasificada como un accidente.' *Matter of Connelly* v. *Hunt Furniture Co.,* 240 N.Y. 83, 87, 147 N.E. 366, 368, 39 A.L.R. 867.

"Para casos como el presente es imposible enunciar una regla general. *Mansbacher* v. *Prudential Ins. Co.,* 273 N.Y. 140, 145, 7 N.E.2d 18. Circunscribiéndonos a la conclusión que aquí se hace y que ratificamos, resolvemos que la reclamante tenía derecho a compensación. *Cf. Industrial Commission of Ohio* v. *Middleton,* 126 Ohio St. 212, 184 N.E. 835."

Para otros casos en pro y en contra de la doctrina que declara compensables lesiones sufridas a causa de un enfria-

---

([5]) De acuerdo con la Ley de Compensación a Obreros del Estado de Nueva York, bajo la cual fué resuelto este caso, las lesiones o lesiones personales son compensables únicamente si son de carácter accidental. Dicho estatuto no define la palabra *accidente* pero las cortes de aquel estado han adoptado una definición similar a la de Webster.

miento, véase 3 Schneider, *Workmen's Compensation Statutes*, pág. 2410. En *Masse* v. *James H. Robinson Co.*, 92 N.E. 2d 56 (1950) se cita con aprobación la doctrina sentada en el de *Lurye*, supra, al efecto de que no puede resolverse si determinado suceso es un accidente industrial a base de una definición legal, sino que debe resolverse a base del punto de vista del sentido común del hombre promedio.

El recurrente cita en su alegato varios casos donde se ha definido el término "accidente". Algunos provienen de jurisdicciones donde el propio estatuto define dicho término y en otros se adopta, en términos generales, la definición de Webster copiada anteriormente en esta opinión. Algunos de estos casos en nada ayudan a su contención. El que más similitud guarda con el de autos, es el de *Zaft* v. *Industrial Commission of Ohio*, 18 N.E.2d. 122. De acuerdo con sus hechos, Rose Zaft trabajaba como costurera en una fábrica. Por algún tiempo venía sufriendo un resfriado. Un día, mientras se encontraba sentada a la hora del almuerzo, cerca de una ventana cerrada, otro de los empleados la abrió y Rose sintió como si el viento le hubiera azotado la cara. Inmediatamente ella cerró la ventana. Un poco más tarde, la ventana fué abierta nuevamente y Rose sintió en su cara como el impacto de un pedazo de hielo. Desde su primera exposición al viento, ella sintió dolor en la cara. Cuatro días más tarde un doctor diagnosticó su dolencia como una parálisis de Bell. Se le negó compensación a base de que la lesión no surgió en el curso de su empleo, diciéndose, "Concediendo que ella sufrió una lesión, la misma provino de la acción directa del viento sin la intervención de ninguna otra cosa que en forma alguna estuviese conectada con su empleo, y por tanto, no surgió en el curso de su empleo." Este razonamiento no puede aplicarse al caso de autos. Aquí existe un factor conectado con el empleo de la obrera, a saber, el calor anormal producido por el vapor del agua caliente usada para esterilizar la loza.

Una interpretación liberal de nuestra Ley de Compensaciones por Accidentes del Trabajo a la luz de sus propósitos benéficos,—*Crespo v. Com. Indem.*, supra, y *Atiles v. Com. Industrial*, 69 D.P.R. 630—nos mueve a resolver que la obrera Matilde Ortiz de Santiago, sufrió una lesión compensable bajo el artículo 2 de dicha ley.

*Debe, por tanto, confirmarse la resolución recurrida.*

